COURT OF APPEALS
DECISION
DATED AND FILED

March 11, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP811**

Cir. Ct. No. **2019CV1848**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN EX REL. MICHAEL A. SVEUM,

PETITIONER-APPELLANT,

V.

LANCE A. WIERSMA,

RESPONDENT-RESPONDENT.

---

APPEAL from an order of the circuit court for Dane County: VALERIE BAILEY-RIHN, Judge. *Affirmed in part; reversed in part and cause remanded with directions*.

Before Fitzpatrick, P.J., Blanchard, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Michael Sveum, pro se, appeals a circuit court order affirming decisions of the Wisconsin Department of Corrections to deny each of Sveum's requests to modify special conditions of extended supervision imposed by the Department.[1] Sveum purports to raise exclusively constitutional challenges to eight special conditions. We conclude that, with one partial exception, Sveum fails to establish by a clear preponderance of the evidence that any condition is overly broad in protecting the community and victims or is not reasonably related to his rehabilitation. We also conclude that any additional constitutional arguments he may intend to make are without merit, undeveloped, or both. Accordingly, we affirm on all issues with one exception that requires remand.[2]

¶2 As we explain below, the exception requiring remand involves the aspect of one condition that prohibits Sveum from owning, possessing, or having access to "any" "style of facemask."

¶3 We now briefly summarize some of the pertinent history from the record that is cited by the State, none of which Sveum disputes for purposes of this

_____

[1] The named respondent is the individual division administrator for the Department's division of community corrections, but there is no issue about the proper status of the respondent party and for the sake of simplicity we refer to the party as the Department.

[2] We need not consider Sveum's argument on appeal that the circuit court erred in determining that WIS. STAT. § 302.113(7m)(e)2. (2019-20) prevents supervised persons from raising, within one year after release, non-constitutional challenges to conditions of supervision in petitions for modification of conditions. This is because Sveum raises only constitutional challenges. After the State makes this point, Sveum concedes the point by failing to reply to it. *See **United Co-op. v. Frontier FS Co-op.**,* 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in respondent's brief may be taken as a concession).

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

appeal.[3] Sveum was convicted in December 1994 for violating a restraining order in October 1994. The restraining order prohibited him from contacting A.B.[4] He was given a disposition of 18 months of probation. Sveum's unlawful contact with A.B. involved letting air out of one of her car tires while it was parked outside her residence.

¶4 In addition, A.B. reported that one day in October 1994, Sveum, then her former boyfriend, confronted her in the front entrance to her apartment building. He grabbed A.B., and told her that he would ruin all of her future relationships and that he would be hiding in the bushes and blow her head off.

¶5 A mutual friend of Sveum and A.B. reported to police that Sveum had said all of the following to the mutual friend. Sveum "would never allow [A.B.] to have a relationship with a guy and would harass any relationship she tried to start" with anyone else, because he wanted her to be "single until she's 30

---

[3] Pertinent case histories are also summarized in a series of appellate court opinions and orders.

One set of opinions involves Sveum's 1996 convictions for stalking, harassment, violating a harassment injunction, and criminal damage to property. *See State v. Sveum*, 220 Wis. 2d 396, 584 N.W.2d 137 (Ct. App. 1998) (affirming judgment); *State v. Sveum*, No. 1999AP2437, unpublished slip op. (WI App April 27, 2000) (affirming order denying postconviction motion under WIS. STAT. § 974.06 challenging same judgment); *State v. Sveum*, 2002 WI App 105, 254 Wis. 2d 868, 648 N.W.2d 496 (affirming circuit court order denying Sveum's motion for postconviction relief challenging same judgment); *Sveum v. Smith*, No. 2007AP1846, unpublished slip op. (June 5, 2008) (affirming order denying petition for a writ of habeas corpus in same case).

Another set of opinions involves Sveum's October 2006 conviction for felony stalking after a previous stalking conviction. *See State v. Sveum*, 2009 WI App 81, 319 Wis. 2d 498, 769 N.W.2d 53 (direct appeal), which was affirmed in *State v. Sveum*, 2010 WI 92, 328 Wis. 2d 369, 787 N.W.2d 317, but which was abrogated on a ground not pertinent to this appeal by *United States v. Jones*, 565 U.S. 400 (2012).

[4] We identify the victim using fictitious initials.

and then she would see that he was the only one left that was available." Sveum was not concerned about conditions of the restraining order or of probation because he did not think that "he was going to get caught." Sveum would go into A.B.'s garage when she was not home and check the mileage on her car, and he used a log to track her movements and car mileage. He would go to the residences of men A.B. dated and damage their cars.

¶6    In October 1996, Sveum was convicted of offenses that included felony stalking, based on conduct in April 1996 in which he preyed upon A.B. The conduct included damaging a vehicle owned by a man who dated A.B. This resulted in prison sentences.

¶7    While Sveum was in prison, in 1999 and 2001, he enlisted his sister to help track A.B., providing information about her employment, car, and living arrangements.

¶8    Sveum was released from prison and was placed on parole and probation supervision in July 2002, with conditions that included no contact with A.B., and no possession of photos or items belonging to A.B. In a May 2003 search pursuant to a warrant, police seized items belonging to Sveum and his sister. These items included three photos of A.B, a log recording A.B.'s activities in March, April, and May 2003, including an entry that stated, "3/19 found her," and "a sheet listing addresses of Internet sites for conducting residence searches and background checks."

¶9    In April 2003, police placed a global positioning system (GPS) tracking unit on Sveum's car, which revealed Sveum driving "within yards" of A.B.'s residence and in the vicinity of a pay phone that someone used to place hang up calls to her residence.

¶10   In October 2006, Sveum was convicted of the felony of stalking after a previous stalking conviction based on his conduct regarding A.B. from September 1999 to May 2003.  The circuit court sentenced him to seven years and six months of initial confinement, followed by five years of extended supervision.

¶11   In December 2006, a search of Sveum's prison cell revealed items that included the following:  tax forms for A.B. from three different employers; an envelope addressed to A.B. from a municipal agency; an insurance card for A.B.; notes referencing people whom A.B. had allegedly dated, her employers, cars she had owned, and names and phone numbers of co-workers; and a handwritten list of items that included the following:  "storage unit," "revolvers," "ammo," "knives," "meat grinder," "garbage bags," "saws," "helmet," "gloves," "wig," "tracking device," "facemask," "binoculars," "scanner," "tie-downs," "silencer," "Halloween mask," "Illinois/Minn. Plates," and "chloroform."  This last list also included the following:

> Muriatic Acid—Eats away skin, eyeballs, lungs, etc.  Use elbow length Rubber gloves, rubber apron, face shield & respirator.  Use outside and wash with water.  Cleans blood up.

¶12   In October 2018, Sveum was again released from prison and began the term of extended supervision with the conditions at issue in this appeal.  At that time, the Department informed him of both standard and special rules of supervision ("special" meaning, specific to Sveum) that the Department was imposing on him.[5]

---

[5] The Department "may set conditions of extended supervision in addition to any conditions of extended supervision ... set by the court … if the conditions set by [the Department] do not conflict with the court's conditions."  WIS. STAT. § 302.113(7).  While Sveum makes meritless arguments, discussed in the text, that various special conditions should not be imposed

(continued)

¶13 Sveum filed a motion with the circuit court seeking, as pertinent here, an order modifying some of the Department's special conditions, which the court addressed in an order in April 2019.[6] The order denied this aspect of Sveum's motion on the ground that it was not properly before the court, ruling that he could seek judicial review through a writ of certiorari only after he first exhausted his potential administrative remedies with the Department.

¶14 Sveum then unsuccessfully sought modifications from, in turn, his agent, the agent's supervisor, regional chief, and administrator. The administrator stated in a letter to Sveum that the challenged special rules "bear a reasonable relationship to your rehabilitation while offering protection to the community, and therefore are appropriate."

¶15 Sveum initiated this proceeding by filing a petition for a writ of certiorari in July 2019. The parties briefed the issues and the court entered a decision and order affirming the Department's denial of all modification requests. Below we address in turn the arguments of the parties and our conclusion regarding each modification request.

¶16 Certiorari review of the Department's decision is limited to four inquiries:

> (1) whether the agency acted within the bounds of its jurisdiction; (2) whether it acted according to law; (3) whether its action was arbitrary, oppressive, or

because they overlap with and expand on other conditions imposed by the Department, he does not argue that any of the challenged special conditions must be modified because they conflict with conditions set by the sentencing court.

[6] The Honorable Susan M. Crawford issued this order, but the Honorable Valerie L. Bailey-Rihn issued the writ of certiorari and addressed the issues raised in this appeal.

6

unreasonable and represented its will, not its judgment; and (4) whether the evidence was sufficient that the agency might reasonably make the determination that it did.

*State ex rel. McElvaney v. Schwarz*, 2008 WI App 102, ¶6, 313 Wis. 2d 125, 756 N.W.2d 441. As best we can discern, Sveum now argues that, as to each challenged condition, the Department is not acting "according to law" by imposing an unconstitutional condition.

¶17    We review the Department's decision, not the decision of the circuit court, although as we explain at various points we concur with, and have benefitted from considering, the acute analysis of the circuit court. *See id.*

¶18    We recently had occasion to address constitutional challenges to supervision conditions imposed by a circuit court, as opposed to special conditions imposed by the Department. *State v. King*, 2020 WI App 66, ¶¶13, 18, 24, 394 Wis. 2d 431, 950 N.W.2d 891. However, neither party gives us any reason to think that the following pertinent standards from *King*, which address a range of different types of constitutional challenges that overlap with Sveum's challenges, do not apply equally to Sveum's constitutional challenges to the Department-imposed conditions:

> "[C]onvicted felons do not enjoy the same degree of liberty as those individuals who have not been convicted of a crime." [*State v. Stewart*, 2006 WI App 67, ¶12, 291 Wis. 2d 480, 713 N.W.2d 165].
>
> We apply a two-part test to determine whether a condition of extended supervision is unconstitutional. A condition of extended supervision "may impinge upon constitutional rights as long as" the condition: (1) is not overly broad in protecting the community and victims; and (2) is "reasonably related to the person's rehabilitation." *State v. Rowan*, 2012 WI 60, ¶¶4, 10, 341 Wis. 2d 281, 814 N.W.2d 854 (quoted sources omitted); *Stewart*, 291 Wis. 2d 480, ¶12; *see also State v. Miller*, 175 Wis. 2d 204, 208, 499 N.W.2d 215 (Ct. App. 1993) (stating that this

court uses those same standards when considering whether a supervision restriction is constitutional under the First Amendment).

A condition of supervision is reasonably related to a defendant's rehabilitation if the condition "assists the convicted individual in conforming his or her conduct to the law." *Rowan*, 341 Wis. 2d 281, ¶10, 814 N.W.2d 854 (quoting *State v. Oakley*, 2001 WI 103, ¶21, 245 Wis. 2d 447, 629 N.W.2d 200). This is appropriate in part because "encouraging lawful conduct" increases "protection of the public." *Id.*

Where, …, the condition is content neutral, that is to say, where the condition is imposed without reference to the content of the regulated activity, intermediate scrutiny is applied. *See State v. Jackson*, 2020 WI App 4, ¶6 n.4, 390 Wis. 2d 402, 938 N.W.2d 639; *see also* [*Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017)]. The intermediate scrutiny test allows the government to impose reasonable, content-neutral restrictions on speech that are "narrowly tailored to serve a significant governmental interest." *Packingham*, 137 S. Ct. at 1736 (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quotations omitted)); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoted source omitted). A condition need not be the least restrictive means of advancing the government's interests in order to satisfy the "narrowly tailored" requirement of intermediate scrutiny. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994). Rather, the standard is met so long as the restriction "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Ward*, 491 U.S. at 799 (quotations omitted)).

When a defendant seeks to have conditions of his or her supervision changed, the defendant bears the burden of showing cause for the modification. *See State v. Hays*, 173 Wis. 2d 439, 448, 496 N.W.2d 645 (Ct. App. 1992) (stating that the proponent bears the burden "to establish by a clear preponderance of the evidence that there is cause to modify the terms and conditions of [supervision]"). Further, our analysis takes into account the particular circumstances presented ….

….

… [T]he determination of whether a condition of supervision violates a defendant's constitutional right is a

question of law which we review de novo. *Stewart*, 291 Wis. 2d 480, ¶12.

*King*, 394 Wis. 2d 431, ¶¶20-25 (footnotes omitted). As noted in *King*, also pertinent is the rule that "authority relating to the propriety of conditions of probation is applicable to conditions of extended supervision." *State v. Koenig*, 2003 WI App 12, ¶7 n.3, 259 Wis. 2d 833, 656 N.W.2d 499.

¶19 As to vagueness challenges in particular, a condition "must be sufficiently precise for the probationer to know what conduct is required of him or her." *State v. Lo*, 228 Wis. 2d 531, 535, 599 N.W.2d 659 (Ct. App. 1999). "The underlying basis for such a challenge is the procedural due process requirement of fair notice." *Id.* A condition is not unconstitutionally vague "'if any reasonable and practical construction can be given its language or if its terms may be made reasonably certain by reference to other definable sources.'" *Id.* at 535-536 (quoted source omitted).

¶20 Before addressing the challenged conditions in turn, we make observations about three sets of major deficiencies in Sveum's briefing on appeal, all of which (often in combination) significantly undermine his arguments.

¶21 First, as the State points out, Sveum's opening brief makes only selective references to his history of stalking and violating lawful orders and rules. Sveum appears not to understand the burden he assumes in seeking modification of conditions based on constitutional challenges; it is his burden to show why the conditions are unconstitutional *in light of his particular history*. The issue is whether Sveum can show that "the condition is overly broad in light of the history and actions of this particular" defendant. *See King*, 394 Wis. 2d 431, ¶58. Compounding this pervasive problem, even after the State points out this

deficiency in its response brief, Sveum's reply brief continues to provide what are at best isolated references to pertinent history. This approach omits critical context, which is fatal to many of his arguments, particularly in light of Sveum's burden of proof.

¶22 Second, Sveum frequently ignores the proper standards of review, which as quoted above call for us to review de novo challenged decisions of the Department. Therefore, contrary to Sveum's frequent approach, it does not constitute a developed argument for Sveum merely to question particular circuit court interpretations, which we need not consider.

¶23 Third, also noted by the State, at multiple points in his briefing Sveum inappropriately relies on federal case law interpreting 18 U.S.C. § 3583(d), which requires that supervision conditions imposed by federal courts "involve[] no greater deprivation of liberty than is reasonably necessary for the purposes set forth in" other federal statutes. This federal rule calling for narrow tailoring does not apply in Wisconsin cases, as Sveum implicitly concedes by failing to reply to this point in his reply brief. *See **United Co-op. v. Frontier FS Co-op.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in respondent's brief may be taken as a concession). Instead, as reflected in our quotation from **King** above, we apply the rule that conditions may not be overly broad and must be reasonably related to the rehabilitation.

*Special Rule 010: Wear GPS Device*

¶24 Special Rule 010 requires the following:

> You shall wear a GPS monitoring device and comply with all other requirements of the monitoring system as directed

> by your agent. You shall not tamper with your GPS bracelet. You shall be responsible for the replacement cost [of] lost, stolen, or damaged equipment; except in the case of malfunctioning caused by faulty manufacturing.

Sveum offers no developed argument that might establish by a clear preponderance of the evidence that, as applied to him, the GPS condition is overly broad in protecting the community and victims and is not reasonably related to his rehabilitation. *See King*, 394 Wis. 2d 431, ¶21. It is aimed at protecting A.B. and the community, and at rehabilitating Sveum, by preventing any recurrence of Sveum's persistent and disturbing pattern of stalking A.B., which Sveum pursued despite escalating law enforcement and judicial responses that included a prison sentence. *See State v. Fisher*, 2005 WI App 175, ¶17, 285 Wis. 2d 433, 702 N.W.2d 56 ("A condition reasonably relates to the goal of rehabilitation when it assists the offender in conforming his or her behavior to the law."). We could reject Sveum's argument on this issue for the sole reason that he fails to address his relevant history. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (observing that we may decline to review issues that are undeveloped or inadequately briefed).

¶25 However, for the sake of completeness, we address as best we understand them his assertions that might represent at least the start of developed arguments and we reject as undeveloped any other arguments he may intend to make on this topic. We need not address his misrepresentations of legal authority and his citations to plainly irrelevant legal authority that diverge from the well-established standards summarized in *King*, excerpted above.

¶26 As referenced above, Sveum's challenge to the GPS condition includes references to Fourth Amendment concepts. This includes an argument based on the U.S. Supreme Court holding that it was a search for Fourth

Amendment purposes when authorities required a convicted recidivist sex offender who had completed his sentence to wear a GPS device. *See Grady v. North Carolina*, 575 U.S. 306, 307-09 (2015). Whatever this argument aims at does not adequately take into account the explanation in *Grady* that such a search could be constitutional and that its reasonableness depends on the "totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Id.* at 310.

¶27 In a case post-dating *Grady*, we determined that a GPS requirement for a sex offender did not violate the Fourth Amendment. *Kaufman v. Walker*, 2018 WI App 37, ¶22-44, 382 Wis. 2d 774, 915 N.W.2d 193. We explained in *Kaufman* that, under the Fourth Amendment's "special needs doctrine," a search "'unsupported by probable cause can be constitutional … when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Id.*, ¶¶39-40 (quoted source omitted) (explaining that the "special needs doctrine," which justifies "diminished privacy expectations" under a balancing test, can apply when (1) the primary purpose of government action is not to "uncover evidence of ordinary criminal wrongdoing" but instead to deter future crimes and (2) meeting warrant requirements would be "impractical"). "If a 'special need' exists, the task is to 'balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context.'" *Id.* (quoting *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989)).

¶28 Bearing those legal standards in mind, we agree with the circuit court here that, taking into account the totality of the circumstances and the special needs doctrine, the GPS condition does not violate the Fourth Amendment. The totality of the circumstances and the governmental interest in protecting A.B. from

any form of stalking or violence strongly support the curtailment of Sveum's privacy interests in this manner, at the discretion of the agent. Given Sveum's past proven desire and determined willingness to stalk A.B. over many years and despite criminal court consequences, the governmental interest is extremely high. Applicable here are observations of our supreme court, citing reasoning of the U.S. Supreme Court, regarding the need for supervising agents in appropriate cases to be able "'to respond quickly to evidence of misconduct'" and to be able to rely on "'the deterrent effect'" of "'expeditious searches.'" *See State v. Purtell*, 2014 WI 101, ¶26, 358 Wis. 2d 212, 851 N.W.2d 417 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 876 (1987)).

¶29    On a possibly related note, Sveum emphasizes that he is not a registered sex offender, for whom even lifetime GPS monitoring may not violate the Fourth Amendment. *See Kaufman*, 382 Wis. 2d 774, ¶22-44. He argues that "the privacy expectations of a sex offender pale in comparison to a non-sex offender." This abstract proposition is of no value. The analysis does not call for a comparison between all sex offenders and all other offenders. We have already explained the Fourth Amendment analysis. As to the balance of his constitutional challenge, we are to determine whether Sveum, given his particular history and circumstances, can show that requiring GPS monitoring does not "promote[] a substantial government interest that would be achieved less effectively" without GPS monitoring. We have already noted Sveum's extreme and concerning history.

¶30    Sveum briefly references statements by the Department, in 2018 while Sveum was still confined, that his "general recidivism" and "violent recidivism" risks were classified as "low" under a risk assessment tool used by the Department. However, Sveum fails to explain why these in-custody assessments,

based on factual inputs and algorithms unknown to us, necessarily mean that the Department must supervise Sveum as if there is little to no risk that he will return to his persistent pattern of stalking A.B. For example, it is difficult to square a belief that Sveum presents no risk to A.B. with his threat of death and his gruesome list (while imprisoned for stalking A.B.) of methods to dispose of a corpse.

¶31 Sveum asserts that the Department must be ordered to replace the GPS monitoring condition with the supposedly less restrictive means of accomplishing the same goals by requiring him "to wear a tamper-resistant transmitter" and installing "a receiver in the victim's residence." However, Sveum fails to cite to record evidence that this transmitter and victim-receiver concept represents an effective, available, less-restrictive alternative to GPS monitoring. In this context it is not sufficient for Sveum to toss out a theoretical, purportedly less restrictive alternative. In sum, Sveum's brief reference to this purported alternative does not show that the GPS monitoring condition actually imposed does not serve the goals of protection and rehabilitation or that the condition does not "'promote[] a substantial government interest that would be achieved less effectively absent'" the GPS monitoring. *See* ***King***, 394 Wis. 2d 431, ¶23 (quoting ***Ward***, 491 U.S. at 799).

*Special Rule 008: Internet Restrictions*

¶32 Special Rule 008 provides as follows:

> You shall not possess, utilize, nor have access to a computer and/or computer equipment, or the Internet, without prior agent approval. This includes not possessing, utilizing, or having access to any electronic device that has Internet access or the capability to connect to the Internet, without prior agent approval.

This special condition has the obvious goals of protecting A.B. from further stalking that could be aided or facilitated by electronic means and also to assist Sveum in his rehabilitation by refraining from further abusive conduct toward A.B. Pertinent here, as summarized above, after Sveum was released from prison and was placed on probation supervision in July 2002, with conditions that included no contact with A.B., police seized items belonging to Sveum and his sister that included "a sheet listing addresses of Internet sites for conducting residence searches and background checks," along with items associated with A.B.

¶33 Relying on the authority cited and reasoning contained in *King*, we reject Sveum's primary argument, which is based on the Supreme Court's *Packingham* opinion. As here, in *King* the challenged conditions of extended supervision did not bar King from accessing the Internet or possessing devices capable of accessing the Internet, but in order to do either he was required to first obtain the approval of his agent. *See King*, 394 Wis. 2d 431, ¶¶28-31. One difference from this case, however, is that the conditions in *King* provided that the agent "'shall not withhold permission'" for access to the Internet if the defendant did so through "'public devices'" and for the purpose of "'obtaining employment or performing any legitimate government functions such as filing taxes or renewing [a] driver's license or license plates, etc.'" *See id.* Another difference is that, if King received permission from his agent to possess devices capable of accessing the Internet and King were to access the Internet with the approval of the agent, then King was required to provide the agent with "'the name or number of every electronic mail account he uses, the Internet address of every website he creates or maintains, every Internet user name he uses, and the name and address of every public or private Internet profile he creates, uses, or maintains.'" *Id.*

¶34    In *King*, we made determinations that included the following: King failed to establish that these conditions restricted his freedom of intimate association under the First Amendment; the conditions were not a blanket ban on Internet access, because the supervising agent had authority to approve Internet use and possession of access devices; the conditions were not overbroad because King had been convicted of using computer to facilitate child sex crime and had numerous prior violations of his previous extended supervision and probation supervision rules that restricted his Internet access; the State has a significant interest in protecting the public and children from convicted sex offenders; and the Internet conditions were sufficiently narrow. *See King*, 394 Wis. 2d 431, ¶¶45-71. As part of our analysis, we rejected King's argument that *Packingham* dictates that, because the conditions restricted his access to the Internet, they must be unconstitutionally overbroad. *See King*, 394 Wis. 2d 431, ¶¶32-44.

¶35    For the reasons stated in *King*, Sveum's assertion that the Internet access condition is "contrary to the holding in" *Packingham* is wrong. It is true that the condition at issue in *King* included a carve out that the agent "shall not withhold permission" for access to the Internet if the defendant did so through "public devices" and for the purpose of "obtaining employment or performing any legitimate government functions such as filing taxes or renewing [a] driver's license or license plates, etc." However, we see no reason to consider the absence of that feature in the challenged condition here to be constitutionally fatal. Under the condition here, Sveum is free to ask his agent for permission to make this kind of use of the Internet, on a showing to the agent that it could be done safely under the circumstances as they then exist.

¶36    Sveum asserts that, at least as of the time of the filing of his appellate briefing, his agent had consistently denied him permission to access the

Internet and he argues that there is no guarantee that the agent will ever allow him access. However, we rejected a similar argument in *Miller*. *See Miller*, 175 Wis. 2d at 212 (rejecting argument that "there are no standards to guide the probation officer in granting or denying him permission" to take an action otherwise prohibited by a condition, on the ground that "[a] condition of probation is conceptually different from a police power regulation" and "[i]t is sufficient for constitutional purposes that a criminal defendant has judicial protection from the arbitrary administration of a condition of probation").[7]

¶37 Sveum cites to a federal appellate case for the proposition that the defendant in that case did not have a history that could justify "an outright ban" from use of the Internet. *See United States v. Scott*, 316 F.3d 733, 736-37 (7th Cir. 2003) (reviewing a condition of supervised release prohibiting Internet access because a search of the defendant's computer revealed images of child pornography; noting that in some circumstances defendants "may be ordered to give up the digital world"). The discussion in *Scott* does not support Sveum's challenge here, under the standards we find in *King*.

¶38 Sveum argues that his possession of a list of Internet site addresses for conducting residence searches and background checks "does not even prove that Sveum used the Internet, much less misused it." This argument ignores the reasonable inference that the list was created to assist in his persistent stalking

---

[7] In his reply brief, Sveum notes that a "computer" might be necessary for him "to prepare legal filings," without explaining how he managed to file his type written, obviously computer-assisted pro se briefing in this appeal without agent approval to use a computer for this purpose. In any case, he managed to file these briefs through at least one person's use of at least one computer.

activity, and that this activity had involved using the Internet or that he planned to use the Internet for such activity.

¶39    As part of a pattern of nonsensical and unsupported arguments about this and other conditions, Sveum contends that the Internet-restricting condition is not related to his rehabilitation because it does not "prevent him from having 'family and friends' use the Internet on his behalf to gather information about [A.B.] if he so desired" and because he could stalk "someone" without use of a computer or the Internet.  That this or other of the special conditions could perhaps have been drawn *more* broadly does nothing to advance Sveum's challenge.

*Special Rule 001:  Contact With A.B. Or Family*

¶40    Special Rule 001 provides:

> You shall have no contact, direct or indirect, with [A.B.].
> No contact includes but is not limited to in person, by
> phone, in writing, by electronic device, through social
> media, or through a third party.  You shall have no contact
> with any of her family members.  You shall not be near nor
> on the premise of her residence, or place of employment.

It is self-evident that this no-contact condition reasonably seeks to protect A.B. and to assist in Sveum's rehabilitation.

¶41    Sveum argues that this condition is overly broad in protecting the community and victims.  Sveum's first overbreadth argument is that the condition must be modified to limit the ban to exclude commercial business encounters or unintentional contact.  We reject this argument on the ground that it rests on an assumption that the Department would unreasonably interpret a chance, unintentional contact as a violation.  We do not construe supervision conditions "'in derogation of common sense,'" but instead to avoid unreasonable or absurd

18

results. *See Lo*, 228 Wis. 2d at 538-39 (quoting *State v. Clausen*, 105 Wis. 2d 231, 246, 313 N.W.2d 819 (1982)); *see also id.* at 536-39 (construing a condition that Lo avoid contact with "gang members" to mean avoid contact with individuals whom he knows, or reasonably should know, are gang members).

¶42    Sveum makes a separate overbreadth argument that this condition must be modified to drop the phrase "but is not limited to" before the phrases "in person, by phone, in writing, by electronic device, through social media, or through a third party." But his sole authority is off point, and the Department could reasonably determine here that the circumstances call for a limitation that leaves nothing to Sveum's imagination, should he decide to stalk A.B. yet again. Sveum relies on *Bachowski v. Salamone*, 139 Wis. 2d 397, 407 N.W.2d 533 (1987). As the State aptly points out, that opinion addressed the vagueness or overbreadth of an injunction that prohibited one person from "harassing" another person. *See id.* at 414.

¶43    For a final overbreadth argument challenging this condition, Sveum contends that it must be modified to allow him to have contact with family members of A.B. because his historical stalking conduct "involved only" A.B. The Department may rely on evidence to the contrary. There are reasonable inferences from the evidence in the record that (1) as part of the stalking conduct leading up to the 1996 charges, Sveum would sometimes visit A.B.'s sister's house to look for A.B.'s car; (2) in February 2000, Sveum or someone on his behalf caused flowers and a card to be delivered to A.B. at her work place and pretended to be A.B.'s sister in making the purchase; and (3) in May 2003, Sveum was in possession of a photo copy of an obituary for A.B.'s father. Further, "a condition of extended supervision need not directly relate to the offense for which the defendant is convicted as long as the condition is reasonably related to the dual

purposes of extended supervision." *State v. B. Miller*, 2005 WI App 114, ¶13, 283 Wis. 2d 465, 701 N.W.2d 47.

¶44 Sveum makes constitutional vagueness arguments that conceptually overlap with some of his overbreadth arguments and they fail for similar reasons. He contends that the words "near" and "family members" are not sufficiently precise to provide notice of what is required of him. Again, the reasoning in *Lo* defeats this argument under commonsense interpretations. *See Lo*, 228 Wis. 2d at 536-39; *see also Koenig*, 259 Wis. 2d 833, ¶¶12-13 (rejecting vagueness challenge to condition requiring agent notification when "dating" someone, on the ground that the meaning of "dating" is sufficiently clear). Interpreted in a commonsense manner, the rule requires him to affirmatively avoid any form of contact whatsoever with any person whom he knows, or reasonably should know, to be a relative of A.B. This provides "an objective standard" for purposes of enforcement. *See Lo*, 228 Wis. 2d at 535. Sveum fails even to suggest a hypothetical circumstance that represents an unfair or unwarranted trap for him if one applies a commonsense interpretation of the condition.[8]

---

[8] In his reply brief, Sveum agrees with the State's position that WIS. STAT. § 950.02(3) provides a sufficiently precise definition of "family member" as meaning "spouse, minor child, adult child, sibling, parent, or legal guardian," and on that basis argues that the condition should be modified to include these terms. We reject that request because we do not rest on this definition from chapter 950. We do not know, under a commonsense analysis *of the particular facts of this case*, whether there might not be additional relatives, such as an aunt, a cousin, or a nephew, who might also qualify, depending on all of the circumstances relevant to a potential violation.

In a similar vein, Sveum agrees with the State's position that "near" means a location from which Sveum "could monitor [A.B.'s] activities at her home or workplace," and Sveum argues that the condition must be modified to incorporate this definition. We reject this request because, putting aside the potential merits of this particular definition, we consider it unnecessary to modify the condition to this could-monitor-based formulation.

*Special Rule 002:  Contact With Detective Or A.B. Sister*

¶45    Special Rule 002 provides:

> You shall have no contact, direct or indirect, with [name of former Madison police detective] or with your sister, Renee Sveum.  No contact includes but is not limited to in person, by phone, in writing, by electronic device, through social media, or through a third party.  You shall not be near nor on the premise of their residence, or place of employment.

The reference to the detective requires additional background.  Items recovered in the cell search that included the gruesome list with handwritten reference to "muriatic acid—eats away skin, eyeballs, lungs, etc." also included a copy of the newspaper obituary marking the passing of the father of a detective who had investigated Sveum's stalking conduct.

¶46    When this additional background is added to background already summarized above that includes Sveum enlisting his sister to help track A.B. while he was in prison, these conditions are a reasonable fit to the goals of protecting A.B. and assisting in Sveum's rehabilitation.  The only arguments that Sveum offers to challenge this condition are readily defeated by points we have already made involving Sveum's history of stalking and the requirement that we interpret conditions in a commonsense manner.

*Special Rule 006:  Possession Of Weapons*

¶47    Special Rule 006 provides:

> You shall not possess, utilize, nor have access to any weapons; including but not limited to firearms, firearm--magazine, firearm holster, BB guns, paintball guns, air pellet guns, broken gun, fake gun, gun parts, or any item that resembles a gun or weapons; to include brass knuckles, pepper spray, bow and arrow, or any ammunition.

This condition is easily justified by the evidence that, after threatening to assassinate A.B. from the bushes of her apartment building in October 1994, Sveum engaged in a long pattern of stalking behavior against her, and that while eventually serving prison time for that stalking he possessed a list of items that included "revolvers," "ammo," "knives," and "silencer."

¶48    Sveum contends that "[t]here is no justification for this rule because standard rule #13 (ST 013) bans Sveum from possessing a 'firearm or other weapon, or ammunition." Sveum fails to develop any basis for us to conclude that the Department may not create a more expansive special rule to protect A.B. and encourage his rehabilitation.

¶49    We reject overbreadth and vagueness arguments that Sveum makes based on legal standards that we have already discussed. It is true that the word "weapon" is not defined, but its meaning is clear at a commonsense level. He argues that this condition prohibits him from owning or using "a steak knife, hammer, baseball bat, … motor vehicle, … axe … shovel … [or] chainsaw." However, using a commonsense interpretation, what Sveum is prevented from doing is possessing, using, or having access to any item that, considering all pertinent circumstances, would reasonably be viewed as a weapon. Thus, for example, when kept and used in an ordinary way for an ordinary purposes, the objects he lists are not reasonably viewed as "weapons" that are akin to the items explicitly listed in the condition. In these ordinary contexts, the items that Sveum lists would not be, nor would they resemble, items used to threaten or inflict

injuries on people.[9]  Sveum latches onto an alternative formulation offered by the State and requests modification of the condition to match wording used by the State, but that would not be appropriate.  The commonsense meaning of the current wording is clear.

¶50    As for the phrase "have access to," under a commonsense interpretation Sveum cannot put himself in a position in which he knows, or reasonably should know, that he can possess a weapon.  This defeats Sveum's argument that the condition prevents him from, for example, entering a store that sells BB guns.  In that hypothetical situation, so long as he does not attempt to buy one of the store's BB guns, he has not placed himself in a position to possess it.  Simply being in the store would not allow him to possess a gun and he is obligated to refrain from handling it.

*Special Rule 007:  Possession Of Items From List*

¶51    Special Rule 007 provides:

> You shall not own, possess, nor have access to a wood chipper, chloroform, liniment, muriatic add, tracking devices of any form, ski mask, or any other style of facemask, binoculars, meat grinder, silencer, tie-downs, raw-hide sites, or a storage unit.  You shall at no time ever attempt to disguise or change your appearance.

Each of these items appears on the gruesome list that Sveum created while in prison for stalking A.B.  Given his statements to and activities regarding A.B., it is

---

[9]  But context would matter.  If, for example, Sveum possessed a chainsaw when he had no non-violent or non-threatening reason to have a chainsaw, or if he kept a steak knife in a container along with such items as a pair of gloves, a wig, and binoculars, then the chainsaw and the steak knife might qualify as having the appearance of weapons, depending on all circumstances.

a reasonable inference that Sveum created this list in contemplation of killing A.B. and disposing of her body. Only Sveum would know for certain where this might have fallen on the continuum between a mere gruesome mental image and an actual, concrete gruesome plan. However, the Department is not obligated to assume positive motives, given the evidence in the record.

¶52 Sveum argues that the following phrases are overly broad in protecting the community and victims: "tracking devices of any form" and "any … style of facemask." As to tracking devices, Sveum simply asserts that this "includes a smart phone." Whether a smart phone might be a tracking device depends on how the phone is used (including what applications are downloaded onto it); what Sveum is prevented from doing is possessing a smart phone for use as a tracking device. In any case, in our discussion of the Internet restrictions condition above we have already explained that the Department can limit Sveum's access to smart phones, which can be used to access the Internet.

¶53 Turning to "any … style of facemask," we accept one aspect of Sveum's argument, which appears to have two, related components. Sveum raises no objection to the inclusion of "ski mask."

¶54 First, Sveum argues that it would be overly broad in protecting the community and victims to deprive him of the ability to wear "a welding helmet, grinding shield, motorcycle helmet, [or] Halloween mask." We put to the side the motorcycle helmet and Halloween mask references; common sense dictates that a helmet is not a mask and there is no reasonable dispute that it serves the protection of the community and victims to disallow potential stalking wearing a mask of the type worn on Halloween, which Sveum does not have to don for any safety reason. But his point regarding the other examples appears to be that some occupations

and ordinary tasks of life call for masking of the face in some fashion for safety reasons. On a potentially related note, Sveum argues that, due to the COVID-19 pandemic, the condition "actually places the public at risk." Putting the two components together, we understand Sveum to argue that, in at least some circumstances, it would more likely undermine than support protection of the community if Sveum may never wear any "style of facemask."

¶55 In pertinent part, the State responds that "Sveum fails to explain why the COVID-19 pandemic has anything to do with whether this condition is reasonably related to his rehabilitation such that it is not overbroad." Whatever the State means to convey in making this assertion, it misses the mark as a response to Sveum's argument. The State fails to come to grips with the potential implications for public safety if Sveum may not cover his face for safety purposes at any time in any setting.

¶56 For these reasons, we reverse the circuit court's decision on this particular aspect of this condition. Accordingly, we direct that the circuit court on remand order the Department to modify the condition to eliminate the phrase "or any other style of facemask" from the current version of the condition because this unqualified phrase does not satisfy the constitutional requirement of protecting the community. Neither party has suggested language to modify this unqualified phrase, and it would be for the Department to modify or qualify the phrase that we order deleted.[10]

_____

[10] To clarify, it is the unqualified nature of the phrase "or any other style of facemask" that presents the problem in the current version of the condition. We express no opinion as to whether a new version of the condition might pass muster if the Department were to include this same phrase, but add language that qualifies it to take safety issues into account. We observe in this context that, putting aside vagueness and other challenges that we reject, Sveum does not

(continued)

¶57 What remains of Sveum's challenges to this condition are brief vagueness arguments. We now respond to the two particular arguments he suggests, applying commonsense interpretations. First, following our approach above, "have access to" reasonably means that Sveum cannot put himself in a position in which he knows, or reasonably should know, that he can possess the item. Second, "tie downs" reasonably means devices that have the evident purpose of being used to restrain another person in place. It does not mean all materials that could theoretically be used in tying (*e.g.*, shoe laces) or used to tie one object to another object (*e.g.*, electric cords). Such items could qualify as prohibited "tie downs" only with additional contextual evidence that Sveum put himself in position to have access to them for the purpose that they be used to restrain or threaten restraint of another person, outside their ordinary non-threatening or non-violent purposes.

*Special Rule 005: In Or Near Oregon, Wisconsin Or Exclusion Zones*

¶58 Special Rule 005 provides:

> You shall not be near nor within the boundaries of the village of Oregon, Wisconsin nor within any other exclusion zones per your GPS (map of exclusion zones provided).

Sveum acknowledges that the areas identified contain residences of A.B. and her sister. We agree with the State that these are areas where Sveum "may be more

---

clearly object to any prohibition on face coverings that are not necessary for purposes of safety, nor does he at this time offer any argument that is inconsistent with the notion that his agent could reasonably assess whether safety needs dictate that he use a particular style of face covering during designated time periods or for designated activities.

likely to resume his stalking behavior," and that this condition is therefore "reasonably related to helping ensure he conforms his behavior to the law."

¶59 Sveum argues that "there is no justification for this rule because" he is already banned from being near or on the premises of A.B. under a separate condition. But he fails to develop an argument that the Department cannot create a more expansive rule on this topic. He argues that there is "no justification" for banning him from contact with A.B.'s family members, but we have already resolved that issue above. He argues that the zones should be smaller, but provides no coherent rationale in support of this argument. He argues that "near" is constitutionally vague, but without giving us any reason to reach that conclusion.

*Special Rule 009:  No Romantic Relationship*

¶60 Special Rule 009 provides:

> You shall not pursue nor engage in any form of romantic, sexual, intimate, dating, or co-habiting relationship unless approved by your agent.

Given the history summarized above, this condition reasonably allows the Department to monitor during the supervision period whether Sveum is engaging in relationships that involve or appear to hold the risk of criminal conduct preying upon current or former partners.

¶61 Sveum asserts that the Department has no expertise in "healthy relationships," but that is not the issue. And it is axiomatic that the Department may impose conditions reasonably aimed at preventing criminal conduct by Sveum that preys upon A.B. or anyone else.

¶62    Sveum argues that this condition is not needed for his rehabilitation because he completed a domestic violence class in 2012 and, as referenced above, the Department has used a risk assessment tool, based on factual inputs and algorithms unknown to us, that rates his risk level as low. However, as we have already discussed, this does not change the history of Sveum's extreme stalking conduct toward a former romantic partner, and the Department may rely on that history.

¶63    Sveum asserts in one sentence that he "also has a First Amendment right to freely associate with others." This does not even begin to constitute an argument that accounts for the case law cited above which establishes that conditions of supervision may infringe on constitutional rights so long as they are not overly broad to protect the community and victims and are reasonably related to rehabilitation.

¶64    Sveum points out that there is no guarantee that an agent will ever grant him the ability to engage in the types of relationships identified, but we have explained above why this form of argument is unavailing.

¶65    For all these reasons, we affirm the circuit court's decisions, with the following exception. We direct the court on remand to order the Department to strike from the current version of special rule 007 the phrase "or any other style of facemask." We express no opinion as to whether, consistent with constitutional standards, that currently unqualified phrase "or any other style of facemask" could be included in a new version of the condition if accompanied by qualifications that adequately addresses safety issues.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.